**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BIZBUDDING, INC; PARISI SPEED SCHOOL; CORE WELLNESS, LLC; and PALEOMOM.COM, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>365 DATA CENTERS SERVICES, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS**<br>**ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Bizbudding Inc., Parisi Speed School, Core Wellness, LLC, and PaleoMom.com, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against 365 Data Centers Services, LLC and upon personal knowledge as to themselves and their own experiences, their counsel's investigations, and as to all other matters, upon information and belief, allege as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs Bizbudding Inc, ("Biz"), Parisi Speed School ("Speed School"), Core Wellness, LLC ("Core Wellness") and PaleoMom.com ("PaleoMom") (hereinafter "Plaintiffs") bring this class action against 365 Data Centers Services, LLC (hereinafter alternatively "365" or "Defendant") for negligence, breach of contract, unjust enrichment, and a violation of the Connecticut Consumer Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110A, *et seq.*, based upon Defendant's failure to secure its systems and data from cyberattacks, including ransomware attacks, failure to properly secure and manage backup data for its clients and their customers, and failure to properly segment its data security systems.

1

2.      Accordingly, on May 14, 2022, Defendant suffered a ransomware attack that caused the shutdown of their entire cloud network and loss of its clients' data and Critical Infrastructure (the "Ransomware Attack").[1] The Ransomware Attack permanently prevented access to Defendant's cloud infrastructure and Defendant contends that the entire infrastructure must now be rebuilt. The Ransomware Attack and its consequences have prevented and will continue to prevent 365's clients, and the customers of those clients, from conducting any type of routine and ordinary business. Defendant's actions and/or inactions in securing its network are causing Plaintiffs and Class Members to suffer damages amounting to hundreds of thousands, if not millions, of dollars in lost revenue and profit, suffer loss of business reputation and goodwill, and may expose Plaintiffs and Class Members to legal liability.

3.      As a result of the Ransomware Attack experienced by Defendant and as further described below, Plaintiffs and Class Members could not access their websites, customer portals, and other critical information technology infrastructure ("Critical Infrastructure") supported by 365's network systems, thereby causing significant business interruption and disruption and lost revenues. Additionally, Plaintiffs have expended significant time and effort resolving these issues resulting from the Ransomware Attack, including communicating with customers, attempting to find alternate methods of conducting business, and communicating with 365 about the disruption of service, which remains ongoing as of May 27, 2022.

## PARTIES

4.      Plaintiff Biz is a corporation incorporated under the laws of and located in New Jersey. Biz is a webservice provider and client of Defendant. Biz rents web space from Defendant and uses that space to provide its webservices and support to approximately 180 customers. Biz

---

[1] *See* Exhibit 1 – May 25, 2022 Communication

uses webspace rented from Defendant to operate approximately 40% of its business. Since the Ransomware Attack, which is ongoing, Biz has lost between $18,000 - $20,000 in revenue. Biz estimates that its customers have lost over $250,000 in revenue. Biz expects the losses in revenue to continue and has spent dozens of hours attempting to contact customers and Defendant as a consequence of the Ransomware Attack.

5.      Plaintiff Speed School is a customer of Biz and a web-based business that operates three separate LLCs to offer variety of educational seminars in five languages over the internet through four websites: (1) Fascia Training Academy, New Jersey LLC headquartered in Wycoff, New Jersey that provides educational training through its website, which uses Defendant's webspace; (2) Professional Football Strength And Conditioning Coaches Association, which operates under the umbrella of Fascia Training Academy's LLC, and provides services through its website, also hosted on Defendant's webspace; (3) Parisi Training Systems, Inc., subsidiary of Speed School, headquartered at 516 Commerce Street in Franklin Lakes, New Jersey which offers services through its website hosted on Defendant's webspace; (4) Parisi Prep, which is also hosted on Defendant's webspace. In 2021, Speed School's three LLCs generated over $1,500,000 in revenue. Since the Ransomware Attack, which is ongoing, Speed School has lost over $50,000 in revenue. Speed School expects the losses in revenue to continue.

6.      Plaintiff Core Wellness is a Florida corporation headquartered at 174 Water Color Way, Suite 103-358, Santa Rosa Beach, Florida 32459. Using Defendant's webspace, Core Wellness operates a website which provides advice and a community for mothers, as well as hosts a podcast using Defendant's Critical Infrastructure. In 2021, Core Wellness generated approximately $2,100,000 in revenue. Since the Ransomware Attack, which is ongoing, Core

Wellness has lost between $40,000 - $50,000 in revenue. Core Wellness expects the losses in revenue to continue.

7.      Plaintiff PaleoMom is a Georgia based LLC founded by Dr. Sarah Ballantyne in 2013. PaleoMom is incorporated in Georgia and headquartered at 3162 Johnson Ferry Road, Suite 260-343, Marietta, Georgia. Paleomom is a customer of Biz. Using Defendant's webspace, PaleoMom operates a website that sells e-books and online courses which draw from Dr. Ballantyne's PHD in biophysics to educate and inform customers. In 2021, PaleoMom generated approximately $375,000 in revenue. Since the Ransomware Attack, which is ongoing, PaleoMom has lost between $8,000 to $10,000 in revenue. PaleoMom expects the losses in revenue to continue.

8.      Defendant 365 Data Centers Services, LLC is a Connecticut corporation with its principal place of business in Norwalk, Connecticut. It is headquartered at 200 Connecticut Ave Suite 5A, Norwalk, CT 06854.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed $5,000,000.00, exclusive of interest and costs, and all conditions are met.

10.     This Court has jurisdiction over 365 as it maintains its corporate headquarters in this District, and for the following reasons: (1) 365 makes decisions regarding overall corporate governance and management in this District, including decisions pertaining to the software that it sells and/or manages and the maintenance of the integrity of its servers i.e. security measures to protect its clients' access to their electronically stored data; (2) it is authorized to conduct business throughout the United States, including Connecticut; (3) it sells and/or licenses colocation services and cloud computing services throughout Connecticut and the United States; and, (4) it advertises

in a variety of media throughout the United States, including Connecticut. Accordingly, via its business operations throughout the United States, 365 intentionally avails itself of the markets within this state to render the exercise of jurisdiction by this Court just and proper.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District and because 365 is headquartered in this District.

## **FACTUAL ALLEGATIONS**

### *Background*

12.     Defendant 365 is a Connecticut-based private company that provides hybrid data center solutions to small and mid-sized businesses, telecom carriers, and cloud service providers.[2]

13.     Defendant offers colocation,[3] network connectivity & IP services,[4] cloud services,[5] and managed services to its clients and its clients' customers.[6]

14.     Defendant operates 12 colocation facilities across the continental United States, has 86 network points of presence ("POPs"), and operates in 7 cloud regions, while offering "24 x 7 x 365 support."[7]

---

[2] https://craft.co/365-data-centers (last visited May 26, 2022).

[3] Colocation is the practice of renting space for your servers and other computing hardware at a third-party provider's data center facility.

[4] Internet Protocol ("IP") refers to a set of rules that govern how data packets are transmitted over a network; when put into a network communication context, an internet protocol describes how data packets move through a network.

[5] A cloud service is any service made available to users on demand via the Internet from a cloud computing provider's servers as opposed to being provided from a company's own on-premises servers. Cloud services are designed to provide easy, scalable access to applications, resources and services, and are fully managed by a cloud services provider.

[6] *See* https://temp.365datacenters.com (last visited May 26, 2022).

[7] *Id*.

15.     Defendant was founded in 2002, and since its last round of funding in 2014, during which it raised $16 million, Defendant has raised over $71 million in total funding from private-equity funds.[8]

***Defendant's Services, Recommendations, and Representations***

16.     Defendant's trademarked corporate motto is "Speed. Reliability. Security. Redundancy. Service. Keeping You and Your Data Connected." To those ends, 365 represents that 365's "colocation, network, and cloud services deliver[] results" to businesses that "demand[] unparalleled agility, scalability, reliability, and performance."[9] Defendant has approximately 1,300 clients for whom it provides services directly.

17.     Defendant's website states that through its "nationwide network backbone, 365 delivers low latency service, lower transport costs and supports disaster backup plans."[10]

18.     On the WayBack Archive's snapshot of Defendant's (now defunct)[11] website, it touts its Managed Services and promises to provide clients and their customers: "Enterprise Managed Services[;] Disaster Recovery as a Service[;] Managed Security and Firewall[;] Private and secure Business Continuity office space[; and] Comprehensive cloud or hybrid backup solutions."[12]

19.     For cloud services, Defendant touts itself as an "[i]ndustry-leading server, storage, compute and software resources" able to "[d]ynamically scale computing resources" on a "cloud portal with a single pane of glass" that offers "24/7/365" support and monitoring.[13]

---

[8] https://craft.co/365-data-centers (last visited May 26, 2022).

[9] https://temp.365datacenters.com (last visited May 26, 2022).

[10] https://temp.365datacenters.com (last visited May 26, 2022).

[11] Because Defendant's website is still unavailable, archived versions of Defendant's website have been linked.

[12] http://web.archive.org/web/20201007212602/https://www.365datacenters.com/services/managed-services/ (last visited May 26, 2022).

[13] http://web.archive.org/web/20201007212602/https://www.365datacenters.com/services/managed-services/

20.     Defendant also promises its customers connectivity and states that its network's "backbone" will ensure its clients and their customers have "secure and reliable access" to their "most critical applications and infrastructure."[14] It states:

> The 365 Data Centers backbone is a **fully redundant network** providing our clients scalable solutions for their business systems in our data centers and cloud infrastructure. Our network is monitored and managed 24/7/365 by 365 Data Centers' certified technicians. With connectivity to major carriers, **we provide secure and reliable access to your most critical applications and infrastructure**. Our engineers work with you to configure the optimal network connectivity to meet your Internet, cloud, colocation, remote office and private network requirements.[15]

21.     For its Colocation Services, Defendant's *Colocation Datasheet* states:

> With over ten years of continuous uptime across our data centers, you can rest assured that 365 Data Centers is laser focused on delivering reliable and secure colocation services no matter what happens. We have 24/7/365 monitoring and meet the data retention and security requirements to achieve compliance with HIPAA, PCI DSS, SOC 2, SSAE 18 and ISAE 3402. ***We are so confident in our systems that we offer a 100% power SLA[16] guarantee***.[17]

22.     Defendant also offers "Disaster Recovery as a Service."[18] There, it recognizes that "[o]ver 40% of businesses affected by disasters never recover, according to the Insurance Information Institute and FEMA."[19] Defendant promises that its "dependable, state-of-the-art" technology solution, "Zerto Virtual Replication," is a "best-of-breed solution that has transformed

---

[14] http://web.archive.org/web/20201007214758/https://www.365datacenters.com/services/connectivity/ (last visited May 26, 2022)

[15] *Id.* (emphasis added)

[16] A Data Center SLA is a service level agreement that covers all the key infrastructure elements and service metrics like power, temperature and network availability. https://www.streamdatacenters.com/glossary/data-center-sla/ (last visited May 26, 2022)

[17] WebArchived, *Colocation Datasheet,* 365 Data Centers, http://web.archive.org/web/20201007165432/https://www.365datacenters.com/getattachment/Services/Colocation/Colocation_06302020.pdf.aspx?lang=en-US (last visited May 26, 2022)

[18] *Id.*

[19] *Id.*

the disaster recovery landscape by delivering enterprise-class, hypervisor-based replication."[20] It

promises that "365 Data Centers delivers a cloud-ready, secure disaster recovery solution for

mission-critical applications."

23.    The Defendant's website further states, in part:

<u>BACKUP AND RECOVERY</u>

Protect your data infrastructure, whether it's one server or a blend of physical and virtual servers, with a comprehensive cloud or hybrid backup solution that can be custom-fit to any business.

**Keep downtime to a minimum**

For mission-critical systems, even small disruptions can have severe consequences. 365 gives businesses all the tools they need to keep critical data accessible and stay agile in today's competitive markets.

**Data disasters take many forms**

Ransomware. Hardware failures. Power outages. Human error. Threats to your data are everywhere and evolving fast. Yet many companies rely on outdated backup technologies to protect their server environment.

**Gain assurance in an uncertain world**

Enjoy the confidence of knowing you can recover and restore crucial systems if your business is threatened with a data disaster. 365s' solutions are easy to deploy and manage so you can focus on other things.

24.    Additionally, Defendant's website offered e-books and white papers to its clients,

such as "Keep Your Data Safe: The Many Layers of Cybersecurity" ("Cybersecurity Ebook").[21]

The Cybersecurity Ebook explores the "many ways" that cybercriminals could attempt to infiltrate

---

[20] *Id.*
[21] Exhibit 2 – Cybersecurity EBook.

networks and urges multiple lines of defense against intrusions and ransomware attacks, as "one

layer of security will not stop these intruders."[22]

25.     The Cybersecurity Ebook also recommends segmenting data into separate systems.

It states:

> Another important strategy will be the "containerization" of
> applications and data. This means applications will run in their own
> virtual containers to keep data and programs separate from all other
> running applications on a computer or mobile device, allowing all
> of them to be more easily portable and protected by an inherent
> security.
>
> One of the chief concerns in the near future will be the proliferation
> of persistent malware. This refers to malware that is able to hide
> deep in device firmware or BIOS (Basic Input Output System).
> Typically, when a computer is infected with malware, the machine
> is wiped clean, reformatted and all software is re-installed.
> Persistent malware would be able to survive such a procedure
> because it could hide itself deeper into the system, or possibly even
> outside of the computer, such as on a network printer or other
> network device firmware, ready to re-infect systems as they are
> added to the network.[23]

26.     Defendant also has a written Privacy Policy that recognizes that its clients and

customers demand and expect adequate data security to protect client and customer information.[24]

It reads, in part:

> 365 Data Centers will protect the confidentiality of its customers'
> information, account information and personal communications to
> the fullest extent possible and consistent with the law and the
> legitimate interests of 365 Data Centers, its partners, its employees
> and other customers of 365 Data Centers services. ***To protect the
> loss, misuse, and alteration of information that is collected from
> customers, 365 Data Centers has appropriate physical, electronic,
> and managerial procedures in place.***[25]

---

[22] *Id.* at 2.

[23] *Id.* at 17.

[24] Exhibit 3 - Privacy Policy.

[25] *Id.* (emphasis added).

*The Ransomware Attack*

27.     On May 14, 2022, 365 was the target of a ransomware attack.[26] Since that point, its website, including its customer portal, has been down and services to its customers were halted. Clients, such as Plaintiff Biz, and the customers of Defendant's clients, such as Plaintiff Superschool and PaleoMom, have been unable to access their Critical Infrastructure, customer data, and respective websites and/or platforms for over 12 days.

28.     The Defendant's website, www.365datacenters.com is no longer functional, and its new website, https://temp.365datacenters.com, has a disclaimer that reads "Notice: Our new website is under construction. We apologize for the limited access at this time, and our new site will launch in the coming days. Thank you for your patience."[27]

29.     On May 24, 2022, Tom Walsh, Defendant's Vice President of Customer Service, sent an email to Defendant's clients. The email read:

> We want to thank those of you who took the time to speak with 365 management yesterday and today.
>
> As of this update, we continue our efforts to clear all obstacles to enable us to initiate the restoration process but have not yet reached that point.
>
> We understand how this incident is affecting your business.  If you prefer, 365 will immediately dedicate all necessary resources and collaborate with you to develop a new 365 cloud environment for your business at no expense to you.  Please let us know if this is your preference.
>
> Thank you for your patience and your support as we continue to work toward restoring services.
>
> Thank you.

---

[26] *See* Exhibit 1 – May 25, 2022 Communication.

[27] https://temp.365datacenters.com

Tom Walsh

Vice President, Customer Service

30.     On May 25, 2022, Plaintiff Biz received an email from Defendant, signed by Bob

DeSantis, Defendant's CEO, and James Cornman, Defendant's CTO. The email read:

> Thank you for your patience over the past 10 days while we worked
> to regain access to the impacted cloud management systems and to
> restore your services following the security incident of May 14th,
> 2022.
>
> We are now able to confirm that the May 14th security incident was
> a ransomware attack. We are also able to confirm that neither 365
> Data Centers nor our customers were the target of this attack. The
> intended target was a third party whose data is stored in a dedicated
> environment on our cloud platform. Unfortunately, for our valued
> customers and 365 Data Centers, the cyber-attacker broadened the
> ransomware attack.
>
> While our investigation continues, an analysis and evaluation to date
> by our systems team and cybersecurity experts has revealed that,
> aside from the targeted third party, no data was taken from the 365
> Data Centers cloud environment and there are no on-going threats
> in the environment.
>
> We worked tirelessly in tandem with our experts and government
> authorities and positioned 365 Data Centers to initiate restoration.
> Unfortunately, the resolution of the third-party circumstances is not
> in our control and continues to prevent us from moving ahead in our
> recovery process.
>
> While we continue to monitor the third party's resolution of the
> cyber-attack, 365 Data Centers believes that at this point in time the
> prudent path forward is to rebuild the affected cloud platform. This
> will be conducted along with an all-out effort to retrieve all data
> within the existing cloud environment that can still be accessed. 365
> Data Centers will work with each customer who prefers to go in this
> direction to restore your service on a rebuilt 365 platform tailored to
> your current needs at our expense. In the event the ransomware
> attack is resolved on all fronts, we can initiate restoration of the
> existing cloud environment in parallel.
>
> If your preference is to work with us to restore your service on a new
> 365 platform, please inform Steve Oakie, 365 Data Centers' Chief

Revenue     Officer.     Steve     can     be     reached     at
soakie@365datacenters.com.

We are saddened by the impact this incident has caused on our many
years of collaborative hard work with you to build your cloud
services. Our entire organization is sorry for the significant
inconvenience that this has brought to you and your business.

We will continue to be transparent by providing factual and accurate
data as soon as it is verified. We appreciate your ongoing support
and patience as we navigate this complex situation.[28]

31.     365 was aware, however, that at all times pertinent hereto, that deficiencies in its

products and services could result in privacy and security vulnerability or compromises and failed

to take adequate measures to protect against any such event.

***Ransomware Threatens Businesses and Individuals***

32.     Ransomware is a subset of malware in which the data on a victim's computer, or

network, is locked, typically by encryption, and where payment is demanded as a condition of

providing the decryption key to unlock the encrypted data and once again make that data available

to the victim.[29]  The motive for ransomware attacks is nearly always monetary, and the demanded

payment is almost always in some form of crypto-currency, typically Bitcoin.[30]

33.     Various forms of ransomware have been used to attack corporate as well as

individual user systems since as early as 2013. For example, the Cryptolocker strain of ransomware

posed as a Trojan horse (malware contained or incorporated within otherwise legitimate-seeming

websites, applications, or attachments to emails or messages). In 2017, the WannaCry ransomware

attacked and encrypted more than 300,000 Microsoft Windows systems globally, demanding

---

[28] Exhibit 1.

[29] Ransomware, http://searchsecurity.techtarget.com/definition/ransomware (last visited May 26, 2022).

[30] *Id.*

payment in Bitcoin in exchange for the data decryption key. WannaCry's mode of operation closely follows ransomware's general methodology:

> When executed, the WannaCry malware first checks the "kill switch" domain name; if it is not found, then the ransomware encrypts the computer's data, then attempts to exploit the SMB vulnerability to spread out to random computers on the Internet, and "laterally" to computers on the same network. As with other modern ransomware, the payload displays a message informing the user that files have been encrypted, and demands a payment of around $300 in bitcoin within three days, or $600 within seven days.[31]

34.     While the extortionist's payment demand is relatively small (ranging between hundreds of dollars to tens of thousands of dollars), the damage wreaked on enterprise and other users' systems runs in to the hundreds of millions of dollars and more.

35.     Unlike a data breach, whose seriousness results from the exfiltration and criminal usage of personally identifiable information or personal health care information, a ransomware attack renders data stored within a computer network or individual computer both unreadable and completely inaccessible to the enterprise or computer user. In the case of a business that depends on webservices to operate, the consequences can mean a complete loss of business functionality.

36.     Accordingly, servers and cloud systems that contain large troves of data are especially attractive targets for ransomware.

37.     Further, it is widely known that ransomware attacks are an increased threat in 2022. In fact, this year saw the number of ransomware attacks increase at "alarming" rate, according to new report.[32]

---

[31] WannaCry Ransomware Attack, https://en.wikipedia.org/wiki/WannaCry_ransomware_attack (last visited May 26, 2022).

[32] *Ransomware attacks increase at "alarming" rate, according to new report,* CYBERTALK.ORG (May 26, 2022), https://www.cybertalk.org/2022/05/26/ransomware-attacks-increase-at-alarming-rate-according-to-new-report/ (last visited May 26, 2022).

38.     The Verizon Business 2022 Data Breach Investigations Report ("2022 DBIR") found that the year-over-year spike in ransomware attacks is greater than that of the past five years combined.[33]

39.     The 2022 DBIR also found that, "[i]n spite of intense alerts and warnings, ransomware continues to ravage organizations, impacting the availability of critical data and assets. Making matters worse, ransomware proved present in nearly 70% of malware breaches, according to the report."[34]

40.     Beyond the overall increase in ransomware attacks, the report also revealed that 82% of cyber breaches occurred on account of "the human element."

41.     According to Cybertalk.org, this human element - social attacks, poor cyber hygiene and individual misuse of equipment -  helped to advance hacker capabilities in 82% of breaches.[35]

42.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[36] Defendant's own publications and recommendations, discussed above, indicate Defendant understands the risks and consequences of inadequate data security and the heightened risk environment within which it operated, including the risk of ransomware attacks.

43.     To prevent and detect ransomware attacks, including the Ransomware Attack at issue here, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited May 26, 2022).

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[37]

44.     To prevent and detect ransomware attacks, including the Ransomware Attack at issue here, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact

---

[37] *Id.* at 3-4.

information you have for the sender is authentic before you contact them.

- **Inform yourself**.   Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[38]

45.     To prevent and detect ransomware attacks, including the Ransomware Attack at issue here, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

---

[38] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited May 24, 2022).

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[39]

46.     Given that Defendant was maintaining data infrastructure and cloud systems for over 1,300 clients and its clients' thousands of customers, including Plaintiffs and Class Members, Defendant could and should have implemented all of the above measures, including those Defendant recommends to its clients, to prevent and detect ransomware attacks. Upon information and belief, Defendant failed to implement at least some of these measures because, according to an individual who allegedly works at 365, the Ransomware Attack resulted from a "combination of an exploit and poor security practice."[40]

---

[39] *See Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited May 24, 2022).
[40] *See* 365throwaway1, *Comment* (May 26, 2022),
https://www.reddit.com/r/sysadmin/comments/urybn4/365_data_centers_ransomware_attack/?utm_source=share&utm_medium=ios_app&utm_name=iossmf (last visited May 27, 2022).

47.     The occurrence of the Ransomware Attack indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Ransomware Attack and the ongoing loss of hundreds of thousands, if not millions, of dollars in revenue for Plaintiffs and Class Members.

48.     As of the filing of this Complaint, 365 has not disclosed the full nature and extent of the attack on its systems; however, upon information and belief, the full functionality of its services has not yet been restored.

***Defendant Failed to Comply with FTC Guidelines***

49.     365 was also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

50.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

51.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[41] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer

---

[41] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, *available at*: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 25, 2022).

networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

52.     The FTC further recommends that companies not maintain data longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[42]

53.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

54.     Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to, and/or deletion of client and/or customer data and any associated client and/or customer backup data is an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

55.     Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to, and/or deletion of Critical Infrastructure of its clients and its clients' customers is an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[42] Federal Trade Commission, *Start With Security: A Guide for Business*, *available at:*
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited May 26, 2022).

*Plaintiffs and Class Members Suffered Damages*

56.     Defendant was at all times fully aware of its obligation to protect the availability and integrity of the data and Critical Infrastructure of its clients and its clients' customers because of its position as a cloud solution, colocation, and managed webservices provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

57.     Plaintiffs and Class Members are clients of 365, purchasers of 365's products, or customers of 365's clients who rely on the integrity of 365's systems for Critical Infrastructure and technology services.

58.     In their everyday business operations, and as an integral part of their business, Plaintiffs and Class Members place significant reliance on their ability to access and transact with the products and services provided by 365.

59.     As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiffs and Class Members suffered, and continue to suffer, economic damage and other actual harm, including monetary losses arising from significant business interruption and disruption, together with expenses incurred in attempts to mitigate such business interruption and disruption.

60.     As of the date of the filing of this Complaint, Plaintiffs and Class Members continue to experience significant business interruption and disruption as a direct and proximate result of their inability to: access and transact with Defendant's products and services; submit electronic prescriptions; and to access any patient records or any of the above modules. 365 wanton, willful, and reckless disregard caused a complete and total interruption of service, and further caused Plaintiff and Class Members monetary and other damages.

61.     365 failed to implement appropriate processes that could have prevented or minimized the effects of the Ransomware Attack.

*Plaintiff BizBudding, Inc.'s Experience*

62.     Plaintiff Biz is a webservice provider and client of Defendant.

63.     Plaintiff Biz entered into contracts with Defendant to, among other things, rent webspace from Defendant through its colocation servers.

64.     One mutually agreed-upon purpose of Biz's contracts with Defendant was that Biz would use that space to provide its webservices and support to approximately 180 customers.

65.     Biz uses webspace rented from Defendant to operate approximately 40% of its business.

66.     Since the Ransomware Attack, which is ongoing, Biz has lost between $18,000 - $20,000 in revenue.

67.     Biz estimates that its customers have lost over $250,000 in revenue.

68.     Biz expects the losses in revenue to continue and has spent dozens of hours attempting to contact customers and Defendant as a consequence of the Ransomware Attack.

69.     365 was at all times fully aware of its obligation to protect the availability and integrity of the data and Critical Infrastructure of its clients, like Biz, because of its position as a cloud solution, colocation, and managed webservices provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

70.     Biz is a client of 365 and purchaser of 365's products who relies on the integrity of 365's systems for Critical Infrastructure and services in order to provide webservices to its customers.

71.     Biz used a portion of the monies paid by its customers to pay Defendant for its services, and Biz expected Defendant to spend that money on information retention, including the creation of backups, and cybersecurity, including the prevention of ransomware attacks.

72.     In their everyday business operations, and as an integral part of their business, Biz place significant reliance on its ability to access and transact with the products and services provided by 365.

73.     Biz also purchased additional "backup" services to ensure that his customers would not lose access to their webpages and Critical Infrastructure after a disaster.

74.     Defendant has now informed Biz that it cannot access the backups for which Biz paid Defendant. Upon information and belief, these backups are either encrypted by the cyberattacker and/or have been deleted from Defendant's systems.

75.     As a direct and proximate result of Defendant's wrongful acts and omissions, Biz has suffered, and continues to suffer, economic damage and other actual harm, including monetary losses arising from significant business interruption and disruption, together with expenses incurred in attempts to mitigate such business interruption and disruption.

76.     As of the date of the filing of this Complaint, Biz and Class Members continue to experience significant business interruption and disruption as a direct and proximate result of their inability to: access and transact with 365's products and services; access cloud infrastructure; access backups of customer data and the codes and/or Critical Infrastructure for any its customers' websites.

77.     Defendant's wanton, willful, and reckless disregard caused a complete and total interruption of service, and further caused Biz and Class Members monetary and other damages.

78.     Defendant failed to implement appropriate processes that could have prevented or minimized the effects of the Ransomware Attack.

79.     Biz acted in reasonable reliance on Defendant's misrepresentations and omissions regarding the security of its product and services and would not have purchased Defendant's

products and/or software had they known that 365 did not take all necessary precautions to protect itself from cyberattack, including ransomware attacks.

80.     Biz would not have purchased Defendant's services had it known that the use of 365's services and/or products was accompanied by an unreasonable risk of business disruption, interruption, and monetary loss.

***Plaintiff Parisi Speed School's Experience***

81.     In 2021, Speed School's three LLCs generated over $1,500,000 in revenue. Since the ransomware attack, which is ongoing, Speed School has lost over $50,000 in revenue. Speed School expects the losses in revenue to continue.

82.     Speed School is a customer of Biz and thus relies on the integrity of 365's systems for Critical Infrastructure and services because it is a customer of 365's client.

83.     365 was at all times fully aware of its obligation to protect the availability and integrity of the data and Critical Infrastructure of its clients and its clients' customers because of its position as a cloud solution, colocation, and webservices provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

84.     In their everyday business operations, and as an integral part of their business, Speed School and Class Members place significant reliance on their ability to access and transact with the products and services provided by 365.

85.     As a direct and proximate result of Defendant's wrongful acts and omissions, Speed School and Class Members suffered, and continue to suffer, economic damage and other actual harm, including monetary losses arising from significant business interruption and disruption, together with expenses incurred in attempts to mitigate such business interruption and disruption.

86.     As of the date of the filing of this Complaint, Speed School and Class Members continue to experience significant business interruption and disruption as a direct and proximate result of their inability to: access and transact with 365's products and services and/or access Critical Infrastructure and/or data maintained by Defendant. Defendant's wanton, willful, and reckless disregard caused a complete and total interruption of service, and further caused Speed School and Class Members monetary and other damages.

87.     Defendant failed to implement appropriate processes that could have prevented or minimized the effects of the Ransomware Attack.

88.     Speed School acted in reasonable reliance on 365's misrepresentations and omissions regarding the security of its product and services and would not have agreed to Biz's use of Defendant's services and Defendant's products and/or software had it known that 365 did not take all necessary precautions to protect itself from cyberattack, including ransomware attacks.

89.     Speed School would not have agreed to Biz's use of Defendant's services had it known that the use of Defendant's services and/or products was accompanied by an unreasonable risk of business disruption, interruption and monetary loss.

***Plaintiff Core Wellness, LLC's Experience***

90.     Core Wellness is a customer of Biz and is thus a customer of one of Defendant's clients. Core Wellness is one of many customers of Defendant's clients who rely on the integrity of 365's systems for Critical Infrastructure and services.

91.     In its everyday business operations, and as an integral part of its business, Core Wellness places significant reliance on its ability to access and transact with the products and services provided by 365.

92.     365 was at all times fully aware of its obligation to protect the availability and integrity of the data and Critical Infrastructure of its clients' customers, like Wellness, because of its position as a cloud solution, colocation, and webservices provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

93.     As a direct and proximate result of Defendant's wrongful acts and omissions, Core Wellness and Class Members suffered, and continue to suffer, economic damage and other actual harm, including monetary losses arising from significant business interruption and disruption, together with expenses incurred in attempts to mitigate such business interruption and disruption.

94.     Since the Ransomware Attack, which is ongoing, Core Wellness has lost between $40,000 - $50,000 in revenue. Core Wellness expects the losses in revenue to continue.

95.     As of the date of the filing of this Complaint, Core Wellness and Class Members continue to experience significant business interruption and disruption as a direct and proximate result of their inability to: access and transact with 365's products and services and/or access Critical Infrastructure and/or data maintained by Defendant. Defendant's wanton, willful, and reckless disregard caused a complete and total interruption of service, and further caused Core Wellness and Class Members monetary and other damages.

96.     Defendant failed to implement appropriate processes that could have prevented or minimized the effects of the Ransomware Attack.

97.     Core Wellness acted in reasonable reliance on Defendant's misrepresentations and omissions regarding the security of its products and services and would not have agreed to Biz's use of Defendant's services and Defendant's products and/or software had it known that Defendant did not take all necessary precautions to protect itself from cyberattack, including ransomware attacks.

98.     Core Wellness would not have agreed to Biz's use of Defendant's services had it known that the use of Defendant's services and/or products was accompanied by an unreasonable risk of business disruption, interruption, and monetary loss.

***Plaintiff PaleoMom's Experience***

99.     PaleoMom contracted for webservices from Biz and is thus a customer of one of Defendant's clients. PaleoMom is one of many customers of 365's clients who rely on the integrity of 365's systems for Critical Infrastructure and services.

100.    In its everyday business operations, and as an integral part of its business, PaleoMom places significant reliance on its ability to access and transact with the products and services provided by 365.

101.    365 was at all times fully aware of its obligation to protect the availability and integrity of the data and Critical Infrastructure of its clients' customers, like PaleoMom, because of its position as a cloud solution, colocation, and webservices provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

102.    As a direct and proximate result of Defendant's wrongful acts and omissions, PaleoMom and Class Members suffered, and continue to suffer, economic damage and other actual harm, including monetary losses arising from significant business interruption and disruption, together with expenses incurred in attempts to mitigate such business interruption and disruption.

103.    Since the Ransomware Attack, which is ongoing, PaleoMom has lost between $8,000 to $10,000 in revenue. PaleoMom expects the losses in revenue to continue.

104.    As of the date of the filing of this Complaint, PaleoMom and Class Members continue to experience significant business interruption and disruption as a direct and proximate result of their inability to: access and transact with 365's products and services and/or access

Critical Infrastructure and/or data maintained by Defendant. Defendant's wanton, willful, and reckless disregard caused a complete and total interruption of service, and further caused PaleoMom and Class Members monetary and other damages.

105.    Defendant failed to implement appropriate processes that could have prevented or minimized the effects of the Ransomware Attack.

106.    PaleoMom acted in reasonable reliance on Defendant's misrepresentations and omissions regarding the security of its product and services and would not have agreed to Biz's use of Defendant's services and Defendant's products and/or software had it known that 365 did not take all necessary precautions to protect itself from cyberattack, including ransomware attacks.

107.    PaleoMom would not have agreed to Biz's use of Defendant's services had it known that the use of Defendant's services and/or products was accompanied by an unreasonable risk of business disruption, interruption, and monetary loss.

## CLASS ACTION ALLEGATIONS

108.    Plaintiffs seek relief in their individual capacities and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), (b)(3), and (c)(4), Plaintiffs seek certification of a Nationwide Class and Nationwide Subclass.

109.    The Nationwide Class is initially defined as follows:

> **All individuals and businesses who are clients of 365 Data Centers that experienced disruptions of service and/or were otherwise affected by the Ransomware Attack against 365 Data Centers that began on May 14, 2022 (the "Nationwide Class").**

110.    The Nationwide Subclass is initially defined as follows:

> **All individuals and businesses residing in the United States that who are customers of 365 Data Center's clients who experienced disruptions of service and/or were otherwise affected by the Ransomware Attack against 365 Data Centers that began on May 14, 2022 (the "Nationwide Subclass").**

111.    Excluded from the above Classes are 365, including any entity in which 365 has a controlling interest, is a parent or subsidiary, or which is controlled by 365, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of 365. Also excluded are the judges and court personnel in this case and any members of their immediate families and staff.

112.    Numerosity. Fed. R. Civ. P. 23(a)(1). The members of the Class and Subclass are so numerous that the joinder of all members is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time, 365 provides services to at least 1,300 clients that each provide service an unknown number of customers.

113.    Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    a.   Whether 365 failed to implement, monitor and audit adequate processes to timely detect, prevent, or mitigate a cyberattack;

    b.   Whether 365's failures and omissions constitute a breach of contract;

    c.   Whether 365's failures and omissions constitute negligence, gross negligence, or negligence per se;

    d.   Whether 365 unreasonably placed its clients and their customers at risk of having their business interrupted and disrupted as a result of a cyberattack;

    e.   Whether 365's system was vulnerable to cyberattack by reason of their acts and omissions;

    f.   Whether 365 violated the Connecticut Unfair Trade Practices Act by failing to implement reasonable security procedures and practices to protect the integrity

and availability of the data on its systems and Critical Infrastructures it supported

g.  Which security procedures and which data-breach notification procedures should 365 be required to implement as part of any injunctive relief ordered by the Court;

h.  Whether 365 has an express or implied contractual obligation to use reasonable security measures;

i.  Whether 365 has complied with any express or implied contractual obligation to use reasonable security measures;

j.  What security measures, if any, must be implemented by 365 to comply with its express or implied contractual obligations;

k.  What the nature of the relief should be, including equitable relief, to which Plaintiffs and Class Members are entitled.

114.    All members of the proposed Nationwide Class are readily ascertainable. 365 has access to the addresses and other contact information for members of the Nationwide Class, who are their clients, which can be used for providing notice to many Class Members. Further, all members of the proposed Nationwide Subclass are readily ascertainable, as 365 has access to the customer data of its clients, which can be used for providing notice to members of the Nationwide Subclass.

115.    Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class Members because Plaintiffs were denied access to the Defendant's services and Critical Infrastructure as a result of the Ransomware Attack, resulting in an interruption in their business operations, like every other class member.

116.    Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including privacy litigation.

117.    Superiority of Class Action. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

118.    Damages for any individual class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class and Subclass.

119.    Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because 365 has acted or has refused to act on grounds generally applicable to the Class and Subclass, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclass as a whole.

## COUNT I

### NEGLIGENCE

**(On Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Subclass)**

120.    Plaintiffs repeat and fully incorporate all factual allegations contained in paragraphs 1 through 119 as if fully set forth herein.

121.    Defendant owed a duty to Plaintiffs, the Nationwide Class, and the Nationwide Subclass to exercise reasonable care to safeguard its systems and data from cyberattack, including ransomware attacks.

122.    Defendant owed a duty to Plaintiffs, the Nationwide Class, and the Nationwide Subclass to exercise reasonable care in safeguarding and protecting their business's Critical Infrastructure and keeping the client and/or customer data maintained by Defendant from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's data security systems to ensure that Plaintiff's and Class Members' client and customer data in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its data systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data and cyber security measures consistent with industry standards.

123.    Defendant knew that Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's businesses Critical Infrastructure, client and/or customer data, and/or websites were intricately tied to the functionality of Defendant's services. Defendant also knew of the serious harms that could happen if Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's access to their Critical Infrastructure was interrupted, and/or any data within Defendant's systems was wrongfully disclosed, that disclosure and/or interruption was not fixed, or Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's data was not properly backed up and/or segmented.

124.    Defendant had a common law duty to prevent foreseeable harm to those whose Critical Infrastructure and business data it stored on its cloud. This duty existed because Plaintiffs,

the Nationwide Class, and the Nationwide Subclass were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs, the Nationwide Class, and the Nationwide Subclass would be harmed by the failure to protect their Critical Infrastructure and business data because hackers routinely attempt to use ransomware to encrypt, disrupt, and/or steal such information and use it for nefarious purposes, Defendant knew that it was more likely than not Plaintiffs, the Nationwide Class, and the Nationwide Subclass would be harmed.

125.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such Critical Infrastructure and business data from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's Critical Infrastructure and business data in Defendant's possession was adequately secured and protected, in addition to maintaining segmented data systems that contain backups of data necessary for business functionality.

126.    Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's Critical Infrastructure and business data by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite repeated failures and intrusions, and allowing a ransomware attacker to disrupt business operations and permanently deprive Plaintiffs, the Nationwide Class, and the Nationwide Subclass of their business data, including website infrastructure and customer information.

127.    Defendant breached the duties it owed to Plaintiffs, the Nationwide Class, and the Nationwide Subclass described above and thus was negligent. Defendant breached these duties by,

among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Critical Infrastructure and business data of Plaintiffs, the Nationwide Class, and the Nationwide Subclass; (b) detect the Ransomware Attack before the attacker shut down Defendant's systems; (c) maintain security systems consistent with industry standards; and (d) maintain segmented data storage systems that contained backups of Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's Critical Infrastructure and business data.

128.    Defendant's failure to comply with industry and federal regulations further evidences Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's Critical Infrastructure and business data.

129.    Defendant's breaches of these duties were not merely isolated incidents or small mishaps. Rather, the breaches of the duties set forth above resulted from a long-term company-wide refusal by Defendant to acknowledge and correct serious and ongoing data and cyber security problems.

130.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs, the Nationwide Class, and the Nationwide Subclass, their Critical Infrastructure and business data would not have been compromised, their businesses would have continued to function as usual, and Plaintiffs, the Nationwide Class, and the Nationwide Subclass would not have lost thousands, if not millions, of dollars in revenue. Defendant's negligence was a direct and legal cause of the Ransomware Attack that resulted in the harm to Plaintiffs, the Nationwide Class, and the Nationwide Subclass and all resulting damages.

131.    The injury and harm suffered by Plaintiffs, the Nationwide Class, and the

Nationwide Subclass was the reasonably foreseeable result of Defendant's failure to exercise reasonable care in safeguarding and protecting its systems that contain Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's Critical Infrastructure and business data. Defendant knew its systems and technologies for processing and securing the Critical Infrastructure and business data of Plaintiffs, the Nationwide Class, and the Nationwide Subclass had numerous security vulnerabilities, including a lack of proper data segmentation and a lack of proper backups and/or data redundancies.

132.    As a result of this misconduct by Defendant, Plaintiffs, the Nationwide Class, and the Nationwide Subclass have lost access to Critical Infrastructure and business data that is essential for the proper functioning of their businesses, resulting in lost profits, lost future business opportunities, and loss of goodwill toward their business. Plaintiffs, the Nationwide Class, and the Nationwide Subclass have also suffered consequential out of pocket losses attempting to remedy the consequences of the Ransomware Attack and have spent countless hours attempting to remedy the damages caused by Defendant's negligence.

133.    Defendant breached its duties by failing to implement, monitor, and audit the security of its systems, resulting in the Ransomware Attack that significantly impeded and/or prevented its Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's ability to conduct business by impeding access to and/or deleting Critical Infrastructure, such as website codes, customer portal information, and other data maintained in the ordinary course of Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's business operations.

134.    Neither Plaintiffs, the Nationwide Class, nor the Nationwide Subclass contributed to the Ransomware Attack as described in this Complaint.

135.    As a direct and proximate result of Defendant's conduct, Plaintiffs, the Nationwide Class, and the Nationwide Subclass suffered damages including, but not limited to, disruption and interruption of business operations that led to significant loss of revenue and profits, loss of business data, including websites and other Critical Infrastructure, and an ongoing inability to complete the everyday provision of services to their respective customers.

136.    Defendant's acts and omissions as alleged herein were willful, wanton, and with reckless disregard for the rights of Plaintiffs, the Nationwide Class, and the Nationwide Subclass.

137.    As a result of Defendant's negligence, Plaintiffs, the Nationwide Class, and the Nationwide Subclass suffered damages, including costs incurred as a result of both business interruption and disruption, together with other damages as may be shown at trial.

## COUNT II
## BREACH OF CONTRACT
### (On Behalf of Plaintiff Biz and the Nationwide Class)

138.    Plaintiff incorporates the factual allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

139.    Defendant has approximately 1,300 clients (who are all members of the putative Nationwide Class) that it directly contracts with for the provision of services. Defendant entered into contracts with Plaintiff Biz and Nationwide Class Members for services related to cloud services, network connectivity and IP services, colocation services, and other managed services, including disaster recovery and cybersecurity.

140.    For its clients, Defendant promised to "Keep You and Your Data Connected" and that its network was "fully redundant," thus ensuring that its clients would have "secure and reliable access" to their "most critical applications and infrastructure."

141.    Further, Defendant represented to its clients, Plaintiff Biz and the Nationwide Class, that it would "Protect your data infrastructure, whether it's one server or a blend of physical and virtual servers, with a comprehensive cloud or hybrid backup solution that can be custom-fit to any business." Defendant further promised to:

**Keep downtime to a minimum**

For mission-critical systems, even small disruptions can have severe consequences. 365 gives businesses all the tools they need to keep critical data accessible and stay agile in today's competitive markets.

**Data disasters take many forms**

Ransomware. Hardware failures. Power outages. Human error. Threats to your data are everywhere and evolving fast. Yet many companies rely on outdated backup technologies to protect their server environment.

**Gain assurance in an uncertain world**

Enjoy the confidence of knowing you can recover and restore crucial systems if your business is threatened with a data disaster. 365s' solutions are easy to deploy and manage so you can focus on other things.

142.    Defendant breached its explicit promises of reliability and system security by allowing the Ransomware Attack to compromise Plaintiff Biz's Critical Infrastructure and compromise his ability to provide his customers with webservices.

143.    Additionally, Defendant breached its promise that clients could "recover and restore crucial systems" if a data disaster occurred. However, Defendant has now informed its clients, including Plaintiff Biz, that it is unable to recover the data from its cloud storage systems and it will need to recreate an entirely new cloud infrastructure for each client, from scratch.

144.    Defendant agreed to provide its specialized services in a professional and workmanlike manner. Implicit in performing these contractual duties is an obligation to reasonably safeguard its systems and data from cyberattack, including ransomware attacks, which can cause

an interruption in the flow of an enterprise's routine and everyday provision of services to its clients.

145.    Defendant breached its contracts with Plaintiff Biz and members of the Nationwide Class by failing to reasonably safeguard its systems and data from cyberattack, including ransomware attacks.

146.    As a direct and proximate result of Defendant's contract breaches, Plaintiff Biz and the Nationwide Class sustained actual losses and damages including, but not limited to, lost profits, lost future business opportunities, loss of customer goodwill, damage to business reputation, complete interruption, disruption, and/or loss of Critical Infrastructure, interruption and/or loss of business information, including customer information, and/or complete denial of service and the corresponding inability to operate their business.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Subclass)**

147.    Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 119 as if fully set forth herein.

148.    Plaintiffs bring this claim on behalf of themselves, the Nationwide Class, and the Nationwide Subclass under Connecticut law.

149.    Plaintiffs, the Nationwide Class, and the Nationwide Subclass conferred a benefit Defendant when Plaintiffs and Class Members directly or indirectly entered into agreements with Defendant and directly or indirectly provided payment for the sale and use of its products and services.

150.    In exchange for, and in consideration of, Plaintiffs, the Nationwide Class, and the Nationwide Subclass providing payment for Defendant's products and services, 365 was required

to, and Plaintiffs, the Nationwide Class, and the Nationwide Subclass expected 365 to, implement reasonable security policies and procedures that would have detected, prevented, or mitigated a ransomware attack.

151.    Defendant states that it is an "[i]ndustry-leading" provider of "server, storage, compute and software resources" with cutting edge technology to ensure network security, and that it offers "24/7/365" support and monitoring for its clients in exchange for the fees clients pay to Defendant, a portion of which is derived from the benefit conferred by the contractual payments made by Plaintiffs, the Nationwide Class, and the Nationwide Subclass to 365 or its clients.

152.    As a result of Defendant's acts and omission as alleged herein, 365 has been unjustly enriched to the extent that any portion of such contractual payments that comprises or was intended to comprise spending for adequate security not provided.

153.    Plaintiffs, the Nationwide Class, and the Nationwide Subclass have an interest, both equitable and legal, in the Critical Infrastructure and business data conferred upon, collected by, and maintained by Defendant and that was deleted, stolen, and/or is inaccessible following the Ransomware Attack.

154.    Defendant benefited from receiving Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's business by its ability sell products and services to Plaintiffs, the Nationwide Class, and the Nationwide Subclass at premium prices while inadequately apportioning resources to protect the data systems upon which Plaintiffs, the Nationwide Class, and the Nationwide Subclass relied. Defendant understood this benefit.

155.    Defendant also benefitted from receiving Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's business because the breadth of its client base allowed it to expand

throughout the United States and develop valuable contracts with tele network communications providers and other large enterprises.

156.    Defendant also understood and appreciated that Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's Critical Infrastructure and business data was crucial to the operation of Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's businesses, and its value depended upon Defendant maintaining the privacy, availability, and functionality of that Critical Infrastructure and business data for Plaintiffs, the Nationwide Class, and the Nationwide Subclass to use in their respective businesses.

157.    But for Defendant's advertised willingness and claimed commitment to maintain privacy and cybersecurity, supposed redundancies that would prevent "data disasters" from interrupting business operations, and guarantees of "24/7/365" customer support, the Critical Infrastructure for thousands of businesses would not have been placed within Defendant's network, and the valuable information essential to the operations of thousands of clients' business would not have been transferred to and trusted with Defendant. Indeed, if Defendant had informed Plaintiffs, the Nationwide Class, and the Nationwide Subclass that Defendant's data and cyber security measures were inadequate, Defendant would not have been permitted to continue to operate in that fashion by regulators, its clients, and its clients' customers.

158.    As a result of Defendant's wrongful conduct, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs, the Nationwide Class, and the Nationwide Subclass. Defendant continues to benefit and profit from its retention and use of the monies it saved by implementing inadequate cybersecurity measures, while Plaintiffs, the Nationwide Class, and the Nationwide Subclass continue to suffer, without limitation, loss of expected profits, loss of future profits, loss of customer goodwill, and other harms that are ongoing so long as Defendant

fails to restore Plaintiffs', the Nationwide Class's, and the Nationwide Subclass's access to their Critical Infrastructure and business data.

159.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged in this Complaint, including entering into contracts to provide services that included the provision of Critical Infrastructure and data security for businesses, while at the same time failing to maintain that information and infrastructure secure from intrusion, deletion, and/or theft by hackers and identity thieves.

160.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and still receives, without justification, from Plaintiffs, the Nationwide Class, and the Nationwide Subclass in an unfair and unconscionable manner. Defendant's retention of such benefits under the circumstances makes it inequitable, constituting unjust enrichment.

161.    The benefit conferred upon, received, and enjoyed by Defendant was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain that benefit.

162.    Defendant is therefore liable to Plaintiffs, the Nationwide Class, and the Nationwide Subclass for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the amount Defendant received by representing that it would adequately protect, back up, and maintain the security of Plaintiffs, the Nationwide Class, and the Nationwide Subclass Critical Infrastructure and information, and disgorgement profits Defendant unjustly accrued.

**COUNT IV**
**VIOLATION OF CONNECTICUT'S UNFAIR TRADE PRACTICES ACT ("CUTPA"),**
**CONNECTICUT GENERAL STATUTE § 42-110A, *et seq.***
**(On Behalf of Plaintiffs, the Nationwide Class, and the Nationwide Subclass)**

163.     Plaintiffs repeat and incorporate the allegations contained in paragraphs 1 through 119 as if fully set forth herein.

164.     Defendant, operating through its Connecticut headquarters, engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110A, *et seq.*, including but not limited to the following:

    a.  Fraudulently advertising material facts pertaining to its system and data services by representing and advertising that it would maintain security practices and procedures to safeguard its systems and data from cyberattack, including ransomware attacks, which can cause an interruption in the flow of an enterprise's routine and everyday provision of services to its clients and its clients' customers;

    b.  Misrepresenting material facts pertaining to its system and data services by representing and advertising that it would maintain security practices and procedures to safeguard its systems and data from cyberattack, including ransomware attacks, which can cause an interruption in the flow of an enterprise's routine and everyday provision of services to its clients and to prevent infiltration of the security system so as to safeguard critical business infrastructure and business information from unauthorized access;

    c.  Omitting, suppressing, and concealing the material fact of the inadequacy of the security practices and procedures;

    d.   Engaging in deceptive, unfair, and unlawful trade acts or practices by failing to maintain security practices and procedures to safeguard its systems and data from cyberattack, including ransomware attacks, which can cause an interruption in the flow of an enterprise's routine and everyday provision of services to its clients and to prevent infiltration of the security system so as to safeguard Critical Infrastructure and business information, including customer data;

    e.   Representing that it used certain data security features, such as properly segmented networks and data systems used for storing backups of its clients' and clients' customers' Critical Infrastructure and business data, when it did not properly ensure that those features actually functioned as advertised; and

    f.   Engaging in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the ransomware attack to enact reasonable security practices to safeguard its systems and data from cyberattack, including ransomware attacks, which can cause an interruption in the flow of an enterprise's routine and everyday provision of services to its clients

165.    As a direct and proximate result of Defendant's deceptive trade practices, Plaintiffs, the Nationwide Class, and the Nationwide Subclass suffered injuries, including but not limited to, complete interruption and disruption of business, loss of profits, loss of consumer goodwill, complete denial of service and the corresponding inability to operate their business of providing services to customers.

166.    The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that Plaintiffs, the

Nationwide Class, and the Nationwide Subclass could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

167.    Defendant committed the acts alleged in this Complaint in the conduct of trade or commerce and this action is properly maintainable as a class action under Connecticut Gen Stat § 42-110h.

168.    Further, Defendant knew or should have known that its computer systems and security practices and procedures were inadequate and that risk of a ransomware attack, data breach, or theft was high. Defendant knew or should have known that the data systems containing backups of Critical Infrastructure and business data were improperly segmented. Defendant did not disclose this to its clients or their customers and instead made the misrepresentations described above.

169.    Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs, the Nationwide Class, and the Nationwide Subclass.

170.    Plaintiffs, the Nationwide Class, and the Nationwide Subclass seek injunctive relief, restitution, and civil penalties for Defendant's unfair and/or deceptive business practices in violation of the CUTPA.

171.    The misrepresentations of Defendant, as alleged herein, are material, false, and likely to mislead, and, therefore, constitute deceptive acts or practices in violation of Connecticut General Statute § 42-110b(a), *et seq*.

172.    Further, upon information and belief, Defendant was aware that its data protection practices were insufficient, chose not to remedy the insufficiencies, and thus have used deceptive trade practices against each Plaintiff and Class Member and willfully violated CUTPA.

173.    Under the provisions of Connecticut General Statute § 42-110g, Plaintiffs are entitled to and seek to recover actual damages, punitive damages, and such equitable relief as the Court deems proper, including attorneys' fees. These forms of relief are in addition to and not a substitute for the claim for restitution and other equitable relief alleged in this Complaint.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

a.  For an Order certifying the Nationwide Class and appointing Plaintiff Biz as class representative for the Nationwide Class;

b.  For an Order certifying the Nationwide Subclass and appointing Plaintiff PaleoMom, Plaintiff Core Wellness, and Plaintiff Speed School as Class Representatives for the Nationwide Subclass;

c.  For an Order appointing Plaintiffs' Counsel to represent such Classes;

d.  For a finding that Defendant has been negligent;

e.  For a finding that Defendant breached its contracts with the Nationwide Class.

f.  For a finding that the Defendant has engaged in unfair or deceptive acts or practices in the course of trade or commerce which constitute violations of the Connecticut Unfair Trade Practices Act;

g.  An Order preliminarily and permanently enjoining the Defendant from the use of acts or practices that violate the Connecticut Unfair Trade Practices Act, including, but not limited to, the unlawful acts and practices pleaded in this Complaint;

h.   For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to ransomware protection;

i.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

j.   For an award of actual damages, punitive damages, and compensatory damages, in an amount to be determined;

k.   For an award of costs of suit and attorneys' fees, as allowable by law; and

l.   Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: May 27, 2022

GLANCY PRONGAY & MURRAY LLP

/s/ _Brian Murray_____
BRIAN MURRAY (Juris #403197)
bmurray@glancylaw.com
125 W. Meadow Road,
Wilton CT 06897
Telephone: 212-682-5340

JOHN A. YANCHUNIS*
Florida Bar No. 324681
jyanchunis@ForThePeople.com
PATRICK A. BARTHLE II*
Florida Bar No. 99286
pbarthle@ ForThePeople.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

MICHAEL A. GALPERN*
mgalpern@lawjw.com
STEVEN J. ROGERS, JR.*
srogers@lawjw.com
**JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C**.
1000 Haddonfield-Berlin Road,
Voorhees, NJ 08043
Telephone: (856) 596-4100
Facsimile: (856) 702-6640

*Attorneys for Plaintiffs and putative Classes*

*Motion for Admission *Pro Hac Vice* to be
Submitted

# EXHIBIT 1

---------- Forwarded message ---------
From: 3C5 Customer Service Center (CSC)
<365csc@365datacenters.com>
Date: Wed, May 25, 2022 at U:05 PM
Subject: 365 Data Centers Cloud Restoration Customer Update
To: 365 Customer Service Center (CSC)
<365csc@365datacenters.com>, 365 Datacenters - Service
<service@365datacenters.com>

       

## 365 Data Centers Cloud Restoration Customer Update

**Facilities:** EWR, LGA, IAD
**Date:** 5/25/2022

Thank you for your patience over the past 10 days while we worked to regain access to the impacted cloud management systems and to restore your services following the security incident of May 14, 2022.

We are now able to confirm that the May 14th security incident was a ransomware attack. We are also able to confirm that neither 365 Data Centers nor our customers were the target of this attack. The intended target was a third party whose data is stored in a dedicated environment on our cloud platform. Unfortunately, for our valued customers and 365 Data Centers, the cyber-attacker broadened the ransomware attack.

While our investigation continues, an analysis and evaluation to date by our systems team and cybersecurity experts has revealed that, aside from the targeted third party, no data was taken from the 365 Data Centers cloud environment and there are no on-going threats in the environment.

We worked tirelessly in tandem with our experts and government authorities and positioned 365 Data Centers to initiate restoration. Unfortunately, the resolution of the third-party circumstances is not in our control and continues to prevent us from moving ahead in our recovery process.

While we continue to monitor the third party's resolution of the cyber-attack, 365 Data Centers believes that at this point in time the prudent path forward is to rebuild the affected cloud platform. This will be conducted along with an all-out effort to retrieve all data within the existing cloud environment that can still be accessed. 365 Data Centers

will work with each customer who prefers to go in this direction to restore your service on a rebuilt 365 platform tailored to your current needs at our expense. In the event the ransomware attack is resolved on all fronts, we can initiate restoration of the existing cloud environment in parallel.

If your preference is to work with us to restore your service on a new 365 platform, please inform Steve Oakie, 365 Data Centers' Chief Revenue Officer. Steve can be reached at soakie@365datacenters.com.

We are saddened by the impact this incident has caused on our many years of collaborative hard work with you to build your cloud services. Our entire organization is sorry for the significant inconvenience that this has brought to you and your business.

We will continue to be transparent by providing factual and accurate data as soon as it is verified. We appreciate your ongoing support and patience as we navigate this complex situation.

Bob DeSantis                                                    James Cornman
Chief Executive Officer                                Chief Technology Officer



To place orders, schedule site access, report trouble or manage your user list, please

visit:www.365DataCenters.com. if you have any questions or concerns regarding this incident, please contact the

Customer Support Center atservice@DataCenters.com. If the matter is urgent, you may contact the Customer

Support Center by phone at 1 866 365 6246 option 1 for up-to-date status.

| CORPORATE HEADQUARTERS | 24/7/365 CUSTOMER SUPPORT | SALES INQUIRIES |
|---|---|---|
| 365 Data Centers | 866-365-6246 | 877-365-6246 |
| 200 Connecticut Ave | Service@365DataCenters.com | Service@365DataCenters.com |
| Norwalk, CT, 06854 | | |
| Phone: 415-901-5700 | | |

   

To unsubscribe, please click here.

# EXHIBIT 2



KEEP YOUR DATA SAFE:

# THE MANY LAYERS OF EFFECTIVE CYBERSECURITY

# GUARDING AGAINST COMMON ATTACKS:

## HOW TO PROTECT YOUR BUSINESS

When it comes to security, having multiple layers is the most important defense. This principle was true for medieval kingdoms, and it's true today for organizations working to protect their data from cyber attacks.

Let's go way back in time and consider a castle during the Middle Ages and security lessons learned. Protection included a moat and a drawbridge that offered a limited entry point. These massive structures were often built atop large hills to enable a better view of oncoming armies. Thick stone walls on the exterior proved nearly impenetrable and interior walls added yet even more defense. Add to that a parapet, armed guards and watchtowers, and a castle proved a tough place for aggressors to infiltrate.

A castle coming under attack is no longer something most of us worry about (and, if you do, more power to you!). Instead, our focus is often on the virtual world and the data we store online – be it on private networks or a public cloud. The point is, in either instance, a layered approach to protection is imperative.

In this eBook, we will examine and follow the many different ways hackers and cybercriminals attempt to tap into systems online and syphon data for personal gain. One layer of security won't stop these anonymous intruders. They're too smart and too persistent. Businesses must have multiple means of security to ensure the culprits are cut off at every turn.

# AN EPIC THREAT:

## WANNACRY

The news developed quickly and became exponentially worse in mid-May of 2017. **A cyberattack had rippled across the world. This particularly nasty piece of ransomware was known as WannaCry. Between May 12th and May 15th, an estimated 200,000 computers in about 150 countries were infected.** On the fourth day of the crisis, security experts had determined successful updates by most compromised organizations had effectively stopped the attack. By then, however, its effect and scope was already unprecedented.

Unfortunately, WannaCry is not likely to remain the largest and most crippling ransomware attack for very long. Two months after the strike, Lloyd's of London, the world's oldest insurance market, released a 56-page report that stated a large-scale cyberattack could cost the global economy more than $120 billion, which was the cost of cleaning up both Hurricanes Katrina and Sandy.

Just a few months after WannaCry, another big hack received international attention. This time, it was the cable giant HBO that suffered an attack, in which hackers infiltrated HBO's computer systems and accessed hours and hours of popular shows, as well as sensitive data and internal documents.

3

# TAKING ACTION:

## A STEP-BY-STEP GUIDE TO RISKS & SOLUTIONS

These types of threats are constantly evolving and can be devastating to organizations. What's more, recovery can be a difficult process and often requires the services of a reputable data recovery specialist. While hackers are always refining and updating their methods, many of the same vulnerabilities exploited in the 1980s by famous hackers Mitnik and Morris remain the same today. These include poor passwords, vulnerabilities in operating systems, social networking, exposed open interfaces and more.

Staying protected requires hard work and awareness. Security and convenience are often mutually exclusive, which is a key challenge. People want security, but want it to be transparent to them. In other words, they want to focus on their job at hand, not being a security expert. Organizations must understand no matter how much money they spend, there is no such thing as impenetrable security. Risk mitigation is the best defense.

SECURITY AND CONVENIENCE ARE OFTEN MUTUALLY EXCLUSIVE, WHICH IS A KEY CHALLENGE

4

# TAKING ACTION:
## SPAM PROTECTION

A lot of malware begins life through email. Spam emails can be more than just an annoyance. If designed to do so, opening a malicious email can be all a hacker needs to access a computer (or user), or an entire network, and wreak havoc. **(See attack number 1 in the diagram)** With this danger in mind, spam protection is imperative for anyone with an email account — which covers nearly everyone in the business world.



1. User receives malicious email

**Antispam**

*Spam* **Malicious Email**

2. User clicks on malicious link in the email

**Web Filtering**

*Malicious Link*        *Malicious Link*

3. Website sends various exploits to attempt gaining access

**Intrusion Prevention**

*Exploit*        *Exploit*        **Malicious Site**

*Is the computer fully patched?*

*Is the user trained to recognize socially engineered scams & phishing attacks?*

4. Website gains access & installs malware

**Antivirus**

*Malware*        *Malware*

5. Computer is now controlled by attacker

**Application control & IP**

*Bot Commands & Stolen data*        **Command & Control Server**

*Spam*

If computers are compromised & data is destroyed, are backups readily available?

Is there a disaster recovery plan?

# TAKING ACTION:
## SPAM PROTECTION

**Users must be vigilant and consider the content of the message itself and who it is from.** A message might even come to your inbox from a known colleague or good friend, but there is still the possibility that the sender's email account has been compromised or that it didn't actually come from that person. The best (and safest) practice is to avoid opening any attachment, even from known colleagues, unless it is expected.

**Proper protection must include the following actions:**
- Scan emails for dangerous attachments and links
- Block unsolicited commercial email (UCE)
- Optionally, replace all links in an email with a unique link that, when clicked, sends the user to a spam protection service for scanning before the user is allowed to continue to that destination.

6

# TAKING ACTION:

## SPAM PROTECTION

Though an email might not contain malicious links or attachments, ALL content must be scrutinized. Content that "tricks" the user into performing an action is called a socially engineered attack, or more commonly a phishing attack.

**Examples that should raise suspicion are:**
- An email from the CFO asking to transfer money
- Someone asking for a username and password
- A colleague asking that an unusual task be performed.
- That email you got that you thought was from your bank may be tricking you into revealing your banking account credentials.

Breaking news, collective interests and the names of known people are common tactical topics used to fool users into doing the bidding of the attacker.

**Protection Strategy:**
- Good spam protection software and/or service
- Ensuring users are educated on the most current spam/phishing tactics and provide ongoing education.

58% OF INCIDENTS INVOLVING COMPROMISED USER CREDENTIALS UTILIZED PHISHING ATTACKS.

**-The 2016 Verizon Data Breach Investigations Report**

# TAKING ACTION:

## WEB FILTERING

Let's say that the spam prevention system has failed to block a malicious email and the user has made the mistake of clicking the link within the message **(See attack number 2 in the diagram).** At this point, another level of protection is necessary (remember the castle!). This next level is known as web filtering. It is a security measure that blocks users from connecting to malicious websites and destinations.

Filtering can also be done by category. For example, companies may not only wish to block malicious websites, but also websites that fall into certain categories such as gambling, weapons or worse. Web filtering can take place on several levels. Most commonly, it is implemented at the Internet gateway or firewall. However, web filtering can also be implemented at the user's workstation/laptop/mobile device, etc., and within Domain Name Servers (DNS). While web filtering at the firewall or gateway is the easiest to manage, it might not protect a company's mobile users. As bring your own device (BYOD) becomes a more common practice, this danger has risen.

When a user clicks a malicious link in an email, he/she might not necessarily be behind the corporate firewall. In this case, implementing an endpoint web filter is essential, or at least a software agent that can talk back to the corporate web filter no matter where the user is located. DNS-based web filters are perhaps the easiest to implement since there is nothing to install on the corporate network. OpenDNS is a notable service that is free for home users that will block DNS requests from known malicious hostnames/websites, and connections to any category of the user's choosing.

**Protection Strategy:**
- Multi-layered web filter on the firewall or gateway
- Endpoint protection to safeguard mobile users utilizing software and/or a DNS filtering service

# TAKING ACTION:

## INTRUSION DETECTION AND PREVENTION

If the web filtering system has failed to block the connection to the malicious website, the user's computer can connect to a malicious system **(See attack number 3 in the diagram).** Once the connection is made, it is possible for the attacker's server to attempt to gain control of the computer or install software. This can be done either by taking advantage of known or unknown vulnerabilities on the user's computer, or tricking the user into installing software on their PC using social engineering.

A corporate firewall should have the ability to scan traffic in real-time and detect intrusion attempts on client computers, as well as the company's public Internet-facing servers such as email, web or application servers. This is called an Intrusion Detection/Intrusion Prevention (IDS/IPS) system.

It is absolutely imperative that all computers, servers and network devices on a company's network are fully patched. Most malware will take advantage of known vulnerabilities that have known fixes readily available.

**Protection Strategy:**
- Install an IDS/IPS service at the corporate gateway
- Protect endpoints and mobile users with an IDS/IPS software system
- Educate users on what is safe and how to spot social engineering attempts
- Implement a centralized patching system

# TAKING ACTION:
## ANTIVIRUS/ANTI-MALWARE

Now we move on to the next layer in our security strategy. Let's say that the IDS/IPS services have failed to block the malicious software and the user's computer has vulnerabilities.   It is now up to the antivirus system to save the day. **(See attack number 4 in the diagram)** This is an area of software development that has evolved quickly in recent years. It can be installed on the firewall to examine all traffic as it passes through the Internet gateway, and on the endpoints.    Both are recommended.

Traditionally, antivirus products were definition-based, meaning the software could only detect known viruses that were included in the definition file. Not so long ago, it was also acceptable for antivirus software to update once a week to detect the newest malware. Things have certainly changed. Today, antivirus software must update each hour or every few minutes to detect the latest threats. However, as hackers and cybercriminals become more sophisticated, even this isn't sufficient.

New malware can't be defined fast enough, which brings us into the realm of Zero-day threats – brand new hazards that have no previous history or definition file. These must be identified and blocked as well, in real-time.   Zero-day threats could be something totally new or, more commonly, variants of previously known malware (which is why WannaCry is still a threat). In recent history, some of the most successful ransomware, such as CryptoLocker, TeslaCrypt and Locky have had several variants to work around antivirus software and take advantage of new vulnerabilities.

**PROTECTION STRATEGY:**
• Multi-layered endpoint protection that uses both traditional and next-generation threat detection engines
• Antivirus on the gateway

10

# TAKING ACTION:

## APPLICATION CONTROL AND IP REPUTATION

Implementing all of the measures we've discussed thus far can certainly go a long way in ensuring a secure environment. However, these antivirus services and all other protections can still fail to detect and impede malicious software **(See attack number 5 in the diagram).**

When this worst-case scenario has occurred, the endpoint is under control of the attacker's Command and Control server and can be instructed to do any of the following:



### COLLECT AND SEND PERSONAL INFORMATION

Which is among the most valuable commodities on the black market. This could be credit card numbers, health information, browsing habits, web site credentials, and more.



### PARTICIPATE IN A DISTRIBUTED DENIAL OF SERVICE (DDOS) ATTACK

In this scenario, thousands of computers are coordinated by the attacker to send garbage data to a single point, thus flooding the victim's Internet line. This results in a loss of service for as long as the attack is sustained.

# TAKING ACTION:

## APPLICATION CONTROL AND IP REPUTATION







### ENCRYPT FILES ON THE LOCAL COMPUTER

On the corporate network, then ask for a ransom to get the data back.

### INFECT OTHER COMPUTERS ON THE NETWORK OR INTERNET

This includes hijacking a user's address book and sending malicious emails to all contacts on the infected user's behalf.

### INJECT ADVERTISEMENTS

Pop-ups or links in the web pages you visit.

---

*One of the most worrisome elements of this situation is that the user typically doesn't know that their own computer is infected.* It is beneficial for the malware to remain hidden so that it can continue to do damage and infect other computers.

**Protection Strategy:**
• Multi-layered endpoint protection software
• Corporate gateway application that can detect what applications are using the Internet, where they are connecting and which applications data is being transmitted, then blocking connections to known disreputable IP addresses.

# BE PREPARED:

## QUICKLY RECOVERING FROM DATA LOSS

A risk mitigation plan must include tactics to recover from data loss as quickly as possible. It is important to regularly back up critical data and store those backups in at least three places – two onsite and one offsite. The regularity of backing up data is different for each organization and is based on the level of acceptable risk. This could mean replication once an hour, once a day or continuous real-time replication offsite. Companies must consider how much downtime will cost per hour as well as per day.

**Though prevention is the best medicine, if you suspect your computer or network is infected, there are several steps you should take:**

1. Immediately disconnect the network cable, turn off your WiFi and turn off the suspected computer, or disconnect the Internet from the corporate network or network segment if necessary.

2. If you believe you might have revealed sensitive company-related information, report it to the appropriate people within the organization, including network administrators.

3. If you believe your financial accounts have been compromised, contact your financial institution immediately and close any accounts that might be at risk. Watch for any unexplainable charges to the account.

4. Immediately change any passwords you might have revealed. If you have used the same password for multiple resources, make sure to change it for each account, and do not use that password in the future. A good password management tool (many of which are free) can help you securely keep track of all your passwords and keep them unique.

5. Engage with a security specialist who can counter the attack and implement the appropriate safety measures.

6. If the attack is severe, consider reporting it to the police and filing a report with the Federal Trade Commission.

# NEW AND EVOLVING THREATS:

## CYBERCRIMINALS DO NOT SIT IDLE FOR LONG

As noted throughout this eBook, cybercriminals do not sit idle for long. They are constantly updating their methods and trying new schemes to infiltrate endpoints and networks. As far as users, new technology is integrating into our society at increasingly rapid rates. This is dangerous for several reasons. The business world, and even individuals at home, might use this technology without fully understanding how to protect themselves. Cybercriminals see these new factors as yet another entry point at which they can aim their attacks.

**Two major components that continue to develop:** Bring Your Own Device (BYOD) and the Internet of Things (IoT). Because these are relatively new developments from a myriad of manufacturers, they are difficult to keep updated with the latest security, if not impossible. BYOD in the workplace means employees often bring their own unprotected phones, tablets and laptops into an office. Although these are personal devices, they might have their company email configured, and sensitive corporate files might be saved as well. As far as IoT, more and more devices are becoming connected. It is critical that these devices are identified and kept separate from the production network and protected at the Internet gateway and DNS levels.  IoT is one of the major security challenges in the healthcare industry right now because so many medical devices are network connected with security taking a distant backseat to function and cost to upgrade.

# NEW AND EVOLVING THREATS:
## CYBERCRIMINALS DO NOT SIT IDLE FOR LONG

The very near future will also bring a network of autonomous vehicles, which introduces an entirely different category of security.   These vehicles will need to communicate with the manufacturer, traffic systems and themselves to maintain safety.

There is much to consider and a lot of information to keep track of.  It might be appealing to accumulate a variety of security monitoring tools to combat the growing number of threats. While this might be tempting, it is an approach that is difficult to manage. Instead, it is advisable that businesses invest in a centralized logging and alerting system, known as a Security Information and Event Management (SIEM) system. Regular penetration testing, which searches for and identifies network vulnerabilities, is also an important practice that all businesses should implement into their best practices to identify their weaknesses before the bad guys do.

**Organizations should likewise invest in a security assessment to identify:**
• Vulnerable applications and hardware
• Possible network infrastructure weaknesses
• Information security tactics
• A backup and business continuity plan

15

# THE FUTURE OF SECURITY:
## TOOLS WILL CONTINUE TO EVOLVE

We have used the word "evolve" several times and we'll say it once more. You can expect current security tools will continue to evolve to keep pace with more intricate attacks.

Encryption will become even more prevalent to protect data "at rest," such as data stored in a database or on a hard drive, and data "in flight," meaning data is protected during transmission. This includes emails flowing from sender to recipient, as well as web browsing.   This also means that we'll need to examine that encrypted traffic and data for malicious content.

Fully encrypted hard drives will become common, especially for mobile devices.   This will protect intellectual property on those devices from theft if that device is lost or stolen.

To ensure only approved users are given access to networks, two-factor authentication (2FA) will become a vital practice and is gaining wide acceptance.  2FA provides authentication using two different methods, such as a username/password combination and a code displayed on a cell phone.

So, in this example, you would need both the username/password and the cell phone. One isn't any good without the other. **Up to four factors of authentication can be used:**
- Something you know: username, password, or code
- Something you have: a cell phone, tablet, or key fob
- Something you are: fingerprints, retina pattern
- Somewhere you are: in the corporate office building, or other specific location

# THE FUTURE OF SECURITY:
## TOOLS WILL CONTINUE TO EVOLVE

**Another important strategy will be the "containerization" of applications and data.** This means applications will run in their own virtual containers to keep data and programs separate from all other running applications on a computer or mobile device, allowing all of them to be more easily portable and protected by an inherent security.

One of the chief concerns in the near future will be the proliferation of persistent malware. This refers to malware that is able to hide deep in device firmware or BIOS (Basic Input Output System). Typically, when a computer is infected with malware, the machine is wiped clean, reformatted and all software is re-installed. Persistent malware would be able to survive such a procedure because it could hide itself deeper into the system, or

possibly even outside of the computer, such as on a network printer or other network device firmware, ready to re-infect systems as they are added to the network. A new breed of anti-malware software will be able to audit deep-rooted software and firmware over the entire network on all devices to expose malicious code.

Network access will only be granted to devices that are trusted according to their "trust score". Depending on several factors such as if a device has up-to-date malware protection, belongs to the company rather than the individual. It is a specific class of device, where it's located, the type of connection to the network, etc. A device will be assigned a "trust score." The device is allowed specific access depending on that score.

17

# THE FUTURE OF SECURITY:

## TOOLS WILL CONTINUE TO EVOLVE

SIEM software, as mentioned previously, is growing in popularity and will become more vital as this breed of tool matures.  SIEM applications will allow the gathering of data from many disparate devices over the network and be able to correlate the data to identify abnormal behavior.   Data such as CPU load, memory, network traffic, communication between devices, uptime of devices, door code usage, and even something as innocuous as the speed of the fan on a device, can all be correlated to reveal abnormal behavior. This will lead to a more centralized way to monitor security and will leverage a learning intelligence.

These steps will continue to increase in importance, and more security strategies utilizing artificial intelligence (AI), machine learning and heuristics are sure to develop in an attempt to stay ahead of the bad guys.

18

# 365 DATA CENTERS CAN HELP!

We've gone over many different "attack surfaces" and how to protect those layers.  ***In the modern world <u>we live in, staying safe and being a good "net-citizen" is the cost of doing business.</u>***  365 Data Centers is able to provide assistance with all security concerns, including backup and disaster recovery.  We are extremely confident in  our managed services portfolio which includes: firewall protection, web filtering, antivirus, IDS/IPS, application filtering and IP reputation. Even more importantly, our customers and partners have faith in our methods to keep their systems connected and their data protected. Our staff is the best of the best when it comes to monitoring these services 24/7/365. We ensure your network, servers and applications are always  under our supervision.

At 365 Data Centers we are an advocate for the customer and offer access to experienced experts who provide the best security possible to fit the unique needs and the budget of each client.

Make sure your company is prepared and protected. Call 365 Data Centers today to talk through your specific IT requirements.

Contact us:
**www.365datacenters.com | 866-365-6246**

# EXHIBIT 3

# PRIVACY POLICY

365 Data Centers policies and procedures for handling customer information have been created with the understanding that Internet technologies are still evolving and that Internet business methods are continuing to evolve to meet the needs and opportunities of the changing technologies. As a result, 365 Data Centers policies and procedures are subject to change.

In the course of serving its customers, 365 Data Centers acquires, stores and transmits customer communications and information that customers may regard as private or sensitive. Some of this information - such as the customer's name, address, telephone number, and credit card data - is provided to 365 Data Centers by its customers in order to establish service. Other information - such as the customer's account status, choice of services, and customer logs - is created and maintained by 365 Data Centers in the normal course of providing service. 365 Data Centers also uses cookies, which are small pieces of information that a web site can store in a designated file on a user's computer for various reasons. For example, 365 Data Centers uses cookies on the landing pages of products sold online which record the customer information that is required on the order form. This information is then forwarded to an internal sales tracking database within 365 Data Centers. In addition, 365 Data Centers may store customers' electronic mail and other communications as a necessary incident to the transmission and delivery of those communications.

## Data Security

365 Data Centers will protect the confidentiality of its customers' information, account information and personal communications to the fullest extent possible and consistent with the law and the legitimate interests of 365 Data Centers, its partners, its employees and other customers of 365 Data Centers services. To protect the loss, misuse, and alteration of information that is collected from customers, 365 Data Centers has appropriate physical, electronic, and managerial procedures in place.

## How is customer information used?

365 Data Centers may share customer information with selected partners, for example, to provide customers with information about products which might be of interest to the customer or to enable the customer to take advantage of special partner programs. 365 Data Centers may also use customer information to provide its customers with system information or information about new or upgraded products.

In addition, 365 Data Centers may share its web site usage information about visitors to 365 Data Centers web sites with a third-party advertising company, for the purpose of targeting 365 Data Centers Internet banner advertisements on 365 Data Centers sites and other sites. For this purpose, 365 Data Centers and its partners note some of the pages visited on 365 Data Centers web site through the use of pixel tags (also called clear gifs). The information collected by 365 Data Centers partners through the use of these pixel tags is not personally identifiable.

## Opt Out & Modifications

Customers may opt out of receiving notices of new or upgraded products from 365 Data Centers and 365 Data Centers partners by emailing 365csc@365datacenters.com. However, customers may not opt out of receiving information from 365 Data Centers which is essential for maintaining or updating customers' accounts or system information.

Most customers may access and modify their personal information via their online personal control panel/account information page. All other customers may access and modify their personal information by contacting the appropriate 365 Data Centers billing department.

Domain name customers who have registered a domain name with 365 Data Centers and wish to change the Technical Contact from 365 Data Centers to another company, may send a request to 365csc@365datacenters.com . It is important to note that customer domain name registration information is made publicly available in the registry of domain names.

## Disclosure of customer information and communications

365 Data Centers will not otherwise disclose its customers' personal and account information unless 365 Data Centers has reason to believe that disclosing such information is necessary to identify, make contact with, or bring legal action against someone who may be causing harm or interfering with the rights or property of 365 Data Centers, 365 Data Centers customers, or others, or where 365 Data Centers has a good faith belief that the law requires such disclosure.

365 Data Centers also will not, except for reasons stated below, disclose to third parties the contents of any electronic mail or other electronic communications that 365 Data Centers stores or transmits for its customers.

The circumstances under which 365 Data Centers will disclose such electronic customer communications are when:

it is necessary in order to provide service to the customer;

it is necessary to protect the legitimate interests of 365 Data Centers and its customers;

it is required to cooperate with interception orders, warrants, or other legal process that 365 Data Centers determines in its sole discretion to be valid and enforceable;

and it is necessary to provide to a law enforcement agency when the contents are inadvertently obtained by 365 Data Centers and appear to pertain to the commission of a crime.

365 Data Centers disclaims any intention to censor, edit or engage in ongoing review or surveillance of communications stored on or transmitted through its facilities by customers or others. 365 Data Centers will, however, review, delete or block access to communications that may harm 365 Data Centers, its customers or third parties. The grounds on which 365 Data Centers may take such action include, but are not limited to, actual or potential violations of 365 Data Centers Acceptable Use Policy.

If you have any questions or comments, you can email *Privacy administration* or via post c/o **365datacenters.com**, 200 Connecticut Avenue, Suite 5A, Norwalk, CT 06854.

All Rights Reserved | Acceptable Use Policy | Privacy Policy



